371 A.2d 207

**COMMONWEALTH of Pennsylvania**

v.

**Joseph Britt WIGGINS, Appellant
(two cases).**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1976.

Decided March 16, 1977.

Nolan N. Atkinson, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## ORDER

PER CURIAM.

The Court being equally divided, the judgments of sentence are affirmed.

Former Chief Justice JONES did not participate in the consideration or decision of this case.

Mr. Justice POMEROY filed an opinion in support of affirmance in which Mr. Chief Justice EAGEN and Mr. Justice O'BRIEN join.

Mr. Justice ROBERTS filed an opinion in support of reversal in which Mr. Justice NIX and Mr. Justice MANDERINO join.

## OPINION IN SUPPORT OF AFFIRMANCE

POMEROY, Justice.

Appellant Joseph Britt Wiggins was convicted by a jury of the offenses of robbery, burglary and murder of the first degree in connection with the death of Carol Benson. After the denial of his post-verdict motions, appellant was sentenced to life imprisonment on the murder

conviction and to concurrent sentences of ten to twenty years imprisonment on the robbery and burglary convictions. This direct appeal followed.[1]

Several errors are advanced in support of reversal. One of these relates to an alleged violation of the guarantee against double jeopardy; two relate to the failure of the court of common pleas to suppress certain statements; and two relate to alleged errors at trial. Finding these assignments of error to be without merit, we will affirm the judgments of sentence.

## I.

In all cases of first degree murder this Court is required by statute to "determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist." Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964). It is well settled that "the test of sufficiency of evidence is whether, accepting as true all the evidence, together with all reasonable inferences therefrom upon which the jury could properly have based its verdict, such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt." *Commonwealth v. Carbonetto*, 455 Pa. 93, 95, 314 A.2d 304, 305 (1974); *Commonwealth v. Green*, 464 Pa. 557, 565, 347 A.2d 682, 686 (1975); *Commonwealth v. Long*, 460 Pa. 461, 463, 333 A.2d 865, 866 (1975). It is clear, moreover, that such evidence is to be considered in the light most favorable to the Commonwealth as the verdict winner. *Commonwealth v. Green, supra; Commonwealth v. Long, supra; Commonwealth v. Rife*, 454 Pa. 506, 509, 312 A.2d 406 (1973); *Commonwealth v. Rankin*, 441 Pa. 401, 404, 272 A.2d 886 (1971).

1. The appeal of the judgment of sentence for murder was taken directly to this Court pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, Art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1975–1976). Appeals from the judgments of sentence imposed on the robbery and burglary convictions were certified to this Court from the Superior Court.

See also *Commonwealth v. Rose,* 463 Pa. 264, 267–68, 344 A.2d 824, 825 (1975); *Commonwealth v. Robson,* 461 Pa. 615, 625, 337 A.2d 573, 578 (1975).

■ In this case the Commonwealth's evidence at trial consisted largely of two inculpatory statements obtained by police from appellant. In the first statement appellant stated that he "didn't mean to kill [the victim]." He stated that he climbed in a window of Carol Benson's home and threw something around her neck, and that Benson then fell back, hitting her head. The second statement was in more detail. In it Wiggins stated that he had climbed in the victim's bathroom window in order to get "some money or a TV;" that the victim awoke and began screaming; that a struggle ensued between Wiggins and Benson during which the victim was pushed to the floor; and that Wiggins then fled. A medical examiner for the Commonwealth testified that Carol Benson's death was caused by injuries to her head from a blunt instrument. Review of these facts, and the entire trial record, satisfies us that the evidence was sufficient to sustain the conviction of murder in the first degree.

## II.

■ Appellant first claims that his trial, which followed an earlier mistrial, caused him to be placed twice in jeopardy for the same offense in violation of the United States and Pennsylvania Constitutions.[2] We disagree.

Wiggins had originally been arrested for rape. Neither the first nor the second trial, however, involved the charge of rape. At the first trial, the Commonwealth called as a witness the arresting officer, a Detective Lynch, to testify as to appellant's initial admission of im-

---

2. U.S.Const., Amend. V; Pa.Const., Art. I, Sec. 10. The double jeopardy clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

plication in the murder. On request for an offer of proof, the trial court ruled the testimony admissible, with the understanding that there would be no testimony concerning offenses not the subject of the prosecution before the court.[3] The witness was asked: "And tell the jury exactly what you told the defendant at that time with respect to these warnings [of his constitutional rights]." Detective Lynch replied: "Told the defendant that he was under arrest for rape." Defense counsel immediately moved for a mistrial which was granted.

On this appeal Wiggins concedes that Detective Lynch's testimony causing the declaration of a mistrial was "not [given] pursuant to the instructions of the Assistant District Attorney," but argues that "the prosecution must be responsible for its witnesses." Appellant's Brief at 11. We are not persuaded, however, that the detective's testimony should be imputed to the Commonwealth.[4] Thus, this is not a case where retrial should be barred because of deliberate prosecutional misconduct designed to secure a more favorable opportunity to convict the accused. See *Commonwealth v. Wright*, 439 Pa. 198, 201, 266 A.2d 651, 653 (1970); *Commonwealth v. Metz*, 425 Pa. 188, 228 A.2d 729 (1967); *Commonwealth v. Warfield*, 424 Pa. 555, 227 A.2d 177 (1967); *Commonwealth ex rel. Montgomery v. Myers*, 422 Pa. 180, 220 A.2d 859 (1966).

### III.

Appellant next contends that inculpatory statements he made to the police should have been suppressed. Two arguments are advanced: first, Wiggins was neither advised that he was a murder suspect nor given *Miranda* warnings when the focus of the investigation shifted

3. There is no indication in the record that Detective Lynch was aware of the trial court's admonition.

4. Indeed, the trial judge specifically stated that he did not feel that what transpired was the fault of counsel.

from rape, for which he originally had been arrested and charged, to homicide; and second, the statements were obtained as a result of a period of unnecessary delay between arrest and preliminary arraignment.

For an understanding of appellant's claims it is necessary to recite in some detail the sequence of events in connection with his custody by the police. They are as follows: Wiggins was arrested at 5:45 a. m. on November 21, 1973 for rape and related offenses. He arrived at the South Detective Division in Philadelphia at 6:05 a. m., and at 6:30 a. m. was warned of his constitutional rights, which he waived. During preliminary questioning of appellant between 6:35 a. m. and 8:00 a. m., he made an incriminating oral statement in which he admitted involvement in ten rapes in the Tasker Area Housing Project. After a 45 minute break, appellant accompanied police to the Project Area where he pointed out the locations of the rapes to which he had earlier confessed. The taking of a formal statement began at 11:45 a. m. after Wiggins had been rewarned of his rights. After two hours Wiggins was allowed to rest and attend to his physical needs. The taking of the formal statement resumed at 2:30 p. m. and was completed at about 4:30 p. m.

At some point during the second half of the taking of the formal statement, the police became suspicious that appellant was involved in an unsolved murder, that of Carol Benson. This belief arose from the similarity between the method, as described by Wiggins, that he had used to attack the rape victims, and the manner in which the murder victim had been attacked. In addition, the rapes and the homicide occurred in the same general area. Their suspicions thus aroused, the police informed Wiggins at about 4:30 p. m. that he would be transferred to homicide headquarters for investigation concerning the murder of Carol Benson. At this point appellant exclaimed, "I didn't mean to hurt her." He was not then

questioned concerning this statement. Wiggins was allowed to eat and rest, and at 5:45 p. m. he was transported to the Police Administration Building.

In the hour following his arrival at the Administration Building (6:10 p. m. to 7:10 p. m.) Wiggins was searched, asked several questions for background information and left alone. At 7:10 p. m. he again received *Miranda* warnings, again waived his rights, and was interrogated until 8:30 p. m. During this session Wiggins denied involvement in the Benson murder. At 8:30 p. m. appellant agreed to submit to a polygraph test, which was completed at 9:55 p. m. He was then left alone for 30 minutes until 10:25 p. m. Interrogation then resumed, and by 12:30 a. m. on November 22, 1973 Wiggins admitted his involvement in the murder. Preliminary arraignment took place some time after 3:30 a. m.

## A.

Appellant argues that prior to his initial admission concerning the murder he was not told that he was a suspect in a homicide and did not receive new *Miranda* warnings. As a result, he contends that the statements concerning the homicide should have been suppressed. We cannot agree.

■■ This Court has frequently stated that in reviewing the ruling of a suppression court we are bound by factual findings which are supported by the record. *Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A. 2d 892 (1975); *Commonwealth v. Eden*, 456 Pa. 1, 317 A.2d 255 (1974); *Commonwealth v. Cobbs*, 452 Pa. 397, 305 A.2d 25 (1973); *Commonwealth v. Stafford*, 451 Pa. 95, 301 A.2d 600 (1973); *Commonwealth v. Sharpe*, 449 Pa. 35, 296 A.2d 519 (1972); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968). In this case, the suppression court judge expressly found (1) that prior to the making of any inculpatory statements

as to the Benson murder, Wiggins was advised that he was under investigation for murder; and (2) that an oral inculpatory statement relative to the homicide was voluntarily given.[5]  Furthermore, at the suppression hearing the police officer handling the interrogation testified that Wiggins, prior to his oral inculpatory exclamation, had been advised that "he was going to be sent to Homicide Division . . . in reference to a young colored female that was killed on Vare Avenue in the Projects." [N.T.S.H. 1.43]. Wiggins was thus alerted to the fact that the death of a young black woman was then the subject of a criminal homicide investigation and that he was a potential suspect. This Court has held that this is all that is required to inform an accused that a murder is being investigated.

> "Appellant . . . claims that although he was informed of the burglary charge before his confession, he was not told of the murder charge.  In *Commonwealth v. Boykin*, 450 Pa. 25, 298 A.2d 258 (1972), we held that the defendant who was told that a death was being investigated had been sufficiently informed about the crime and there was no need for more specificity concerning the legal charges of murder or manslaughter.  We said that a defendant is sufficiently alerted to the possibility of involvement in a criminal homicide case if the defendant knows that the victim's death is under investigation." *Commonwealth v. McIntyre*, 451 Pa. 42, 48, 301 A.2d 832, 835 (1973).

Wiggins also argues that his statements must be suppressed because he was not given *Miranda* warnings when the focus of the investigation shifted to murder.

---

5.  This finding was as follows:

> "6.  At 4:30 p. m. defendant was informed that he was going to be transferred to the homicide division in the Police Administration building for questioning concerning the murder of Carol Benson. Upon hearing this, defendant voluntarily stated: 'I didn't mean to hurt her.' There was no questioning of the defendant at this time." Opinion of suppression court at 2.

Accepting that as a general proposition a shift of investigation of a suspect from one crime to another requires a rewarning before interrogation is commenced as to the second offense, such warnings were in fact given in this case. As recited above, the interrogation as to the homicide here involved was conducted at the homicide division, where Wiggins was advised of his constitutional rights at 7:10 p. m., before questioning began. The statement "I didn't mean to hurt her" was made prior to removal to the Police Administration Building, but was blurted out by Wiggins *sua sponte* upon being told that he was then to be taken to homicide headquarters in connection with the death of a young woman who had been "killed on Vare Avenue in the Projects." [6] No questioning by the police precipitated this inculpatory exclamation, nor can it be said that the police conduct was "calculated to, expected to, or likely to elicit an incriminating response . . . ." *Commonwealth v. Yount*, 455 Pa. 303, 309, 314 A.2d 242, 246 (1974). It is thus clear that Wiggins' initial statement relative to the Benson murder was not a result of custodial interrogation, but rather was a volunteered and unsolicited comment. In such a situation, the absence of *Miranda* warnings does not render the statement inadmissible. *Miranda v. Arizona*, 384 U.S. 436, 444, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 706, 726 (1966); *Commonwealth v. Boone*, 467 Pa. 168, 174–176, 354 A.2d 898, 901 (1975) ; *Commonwealth v. Yount, supra*.

### B.

As an alternative ground for the suppression of his statements confessing to the murder of Carol Benson, Wiggins asserts that they were the products of an unnecessary delay in the investigation of the rape charge, and that their admission into evidence violated the rule announced in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.

6. See n. 5, *supra*.

2d 417 (1972). He does not assert a *Futch* violation with respect to the murder investigation carried on at the Police Administration Building viewed by itself, but suggests that, absent the delay in the earlier rape investigation, there would have been no statements with regard to the homicide, and that these statements should have been excluded from evidence for that reason. The theory apparently is that had the defendant been preliminarily arraigned in a timely fashion on the rape charge, he would have been out of police custody prior to his first inculpatory statement as to the homicide.

We are thus asked to hold (1) that a police inquiry into one crime of which the defendant was suspected was conducted illegally because too protracted, and (2) that this illegality tainted the product of a further police inquiry into another, unrelated crime involving a different victim, when the suspicion of the defendant's connection with the second crime arose during the inquiry into the first. We must decline to do so.

In the first place, it is far from clear that there was in fact any "unnecessary delay" in the processing by the police of Wiggins' participation in the rape charge. The elapsed time, while it spanned some 11 hours on November 21, 1973, does not *per se* constitute unnecessary delay. However that may be, the record in the rape case is not before us, and we cannot in this case make a finding as to the legality and admissibility of evidence in another.

Moreover, we have never applied the exclusionary rule of *Futch* so as to relate delay in the interrogation of a suspect concerning one crime to otherwise untainted evidence in another crime merely because the lead to the other crime developed during the inquiry into the first.[7] In our view, such an extension of the *Futch* rule, under the facts of this case, would be unwarranted.

7. The only other case in which we have confronted such a claim is *Commonwealth v. Terry*, 457 Pa. 185, 321 A.2d 654 (1973).

The exclusionary rule announced in *Futch* was occasioned by numerous instances of manifest disregard by the police of the mandatory requirement which since 1965 had been a part of the Rules of Criminal Procedure in this Commonwealth.[8] The requirement is that after a defendant has been arrested, with or without a warrant, "he shall be taken without unnecessary delay" before the proper issuing authority for preliminary arraignment.[9] The exclusion of evidence obtained as a result of violation of these rules was adopted as a means of deterring police officers from continued violations. The exclusion, however, was directed to evidence pertaining to the crime for which the defendant was arrested and was being held in custody. As we said in *Commonwealth v. Cherry*, 457 Pa. 201, 205, 321 A.2d 611, 613 (1974):

> Rule 118 of the Pennsylvania Rules of Criminal Procedure and our decision in *Futch* . . . are specifically designed to put a stop to the practice of arresting an individual and holding him during a lengthy period

There the defendant was originally arrested and questioned on charges of robbery and burglary, to which he confessed. This interrogation led to police suspicion that Terry may have been guilty also of an unsolved murder, to which he did later confess and plead guilty.

In that case Terry's claim that his plea of guilty to murder was motivated by the confession to the unrelated robbery and burglary charges that allegedly had been obtained in violation of Pa.R. Crim.P. 118 was rejected. Mr. Justice O'BRIEN, speaking for himself in announcing the decision of the Court, determined that there was no causal relationship between the delay in questioning on the charges of robbery and burglary, and the confession as to murder. *Terry, supra* at 189, 321 A.2d 654. He stated:

> "Appellant confessed to the murder of the decedent within an hour after the questioning about that crime began. All delay before that time was necessarily related to the [charges of robbery and burglary] or the period when appellant was asleep in the Police Administration Building." *Id.*

8. See Pa.R.Crim.P. 122 as to defendants arrested with a warrant and Pa.R.Crim.P. 130 as to defendants arrested without a warrant in a court case. These rules were derived, respectively from former rules 116 and 118, adopted June 30, 1964, effective January 1, 1965.

9. See n. 8, *supra*.

while continuing the investigation before arraigning him.

In the instant case, as described above, Wiggins' initial confession to the murder of Carol Benson was volunteered. His statement came as a direct result of being informed that he was about to be placed under investigation for murder; no questioning concerning the murder or his involvement in it preceded his statement. Moreover, there is nothing in the record to suggest, nor does appellant contend, that the police were utilizing the alleged protracted rape inquiry for the purpose of conducting an investigation of a murder with which they believed appellant might be connected. Thus, this is not a case where the police intentionally prolonged custodial inquiry into one crime in order to gain evidence against the defendant in another; rather this is a case where the police in the course of interrogation of one crime chanced upon evidence connecting the defendant to a totally different crime. Under these circumstances, the deterrent purpose of *Futch* would not be served by excluding Wiggins' statements concerning the death of Carol Benson. If indeed Pa.R.Crim.P. 122 was violated in connection with the rape inquiry, and this violation resulted in a rape confession, the remedy of excluding that confession at the rape trial is sufficient to satisfy the purpose of *Futch*.[10]

---

10. Appellant advances two other reasons for a new trial. Both are errors claimed to have been committed during the trial. We find no merit in either. The first is that the jury was allowed to view photographs of the scene of the murder prior to their having been formally introduced into evidence, as later they were. While this was undoubtedly improper procedure, we cannot see that appellant was prejudiced. Any misimpression that the pictures may have created as to the position of the victim's body at the time Wiggins fled her apartment was later cleared up by testimony of a Commonwealth witness who was one of the persons who discovered the body. Moreover, the admission of the pictures into evidence was not objected to when they were formally offered.

The other claimed error is the trial court's refusal to give a specific instruction to the jury in the form submitted by counsel.

Former Chief Justice JONES did not participate in the consideration or decision of this case.

Mr. Chief Justice EAGEN and Mr. Justice O'BRIEN join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

ROBERTS, Justice.

Appellant's initial admission was not obtained by the police until $10\frac{3}{4}$ hours after his arrest. His second statement was elicited approximately 6 hours later, after at least $16\frac{3}{4}$ hours in custody. These statements should have been suppressed because they were obtained in violation of the prompt arraignment requirement. Pa.R. Crim.P. 130; *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972).

The opinion in support of affirmance refuses to suppress appellant's admissions because the pre-arraignment delay took place while the police investigated a charge unrelated to the present conviction. I believe the deterrent purposes of the *Futch* rule are undermined by the distinction drawn by the opinion in support of affirmance. Because these statements should have been suppressed, I would reverse appellant's conviction and grant a new trial.

### I

The Rules of Criminal Procedure mandate that a person under arrest be taken without unnecessary delay before a judicial officer for preliminary arraignment. Pa. R.Crim.P. 122 and 130. In *Commonwealth v. Futch*, supra, we held that if evidence obtained during an unneces-

The substance of the requested point was, however, accurately and adequately included in the charge as given. The trial judge was free to select his own form of expression. *Commonwealth v. McComb*, 462 Pa. 504, 509, 341 A.2d 496, 498 (1975); *Commonwealth v. Newsome*, 462 Pa. 106, 110, 337 A.2d 904, 907 (1975).

sary delay has any reasonable relationship whatsoever to the delay, it is not admissible at trial. We have employed a three-part test for determining whether evidence is inadmissible.

"The delay must be unnecessary; evidence that is prejudicial must be obtained; and the incriminating evidence must be reasonably related to the delay."

*Commonwealth v. Williams,* 455 Pa. 569, 572, 319 A.2d 419, 420 (1974). All three parts of the *Williams* test have been established in this case.

Appellant was arrested on rape charges at 5:45 A.M. on November 21, 1973 and taken to the South Detective Division in Philadelphia. Between 6:30 and 8:00 A.M., the police obtained an oral confession on these charges. For the next $6\frac{1}{2}$ hours, the police continued to gather evidence against appellant, transporting him to the neighborhood where the rapes occurred and taking a formal statement from him. While the formal statement was being taken, the police began to suspect that appellant was involved in the murder of Carol Benson. At about 4:30 P.M., $10\frac{3}{4}$ hours after his arrest, the police informed appellant that he would be transferred to homicide headquarters, at which point appellant said, "I didn't mean to hurt her." Appellant was taken to the Police Administration Building for further interrogation concerning the homicide charge. Between 10:25 P.M. and 12:20 A.M., at least $16\frac{3}{4}$ hours after his arrest, the police obtained a second incriminating statement. Appellant asserts that both statements should have been suppressed. I agree.

Extensive pre-arraignment delay solely for the purpose of obtaining incriminating statements or continuing an investigation is unnecessary. See *Commonwealth v. Barilak,* 460 Pa. 449, 333 A.2d 859 (1975); *Commonwealth v. Showalter,* 458 Pa. 659, 328 A.2d 841 (1974); *Commonwealth v. Cherry,* 457 Pa. 201, 321 A.2d 611 (1974); *Commonwealth v. Williams,* supra; *Common-*

*wealth v. Dutton,* 453 Pa. 547, 307 A.2d 238 (1973). Here, the period from 8:00 A.M. to 4:30 P.M. was used by the police to obtain further admissions from appellant and to continue investigation of the rape charges. This entire period constitutes an unnecessary pre-arraignment delay.

After the police completed their investigation of the rape charges, they informed appellant of the homicide investigation, which elicited his first admission. His statement "I didn't mean to hurt her," was clearly prejudicial, satisfying the second prong of the *Williams* test.

In addition, it was the product of the unnecessary delay and therefore should have been suppressed. As the opinion in support of affirmance itself notes, the police first began to connect appellant to the murder of Carol Benson some time between 2:30 and 4:30 P.M., while taking a formal statement relative to the rape charges. It was appellant's description of the rapes, obtained during an unnecessary pre-arraignment delay, which led the police to detect a similarity between the modus operandi of the rapes and the Benson homicide. Thus, the police investigation which took place in lieu of the prompt arraignment guaranteed by Pa.R.Crim.P. 130 produced appellant's first admission, 10¾ hours after his arrest. Appellant's statement was reasonably related to the unnecessary delay. Appellant's second statement, taken at the Police Administration Building at least 6 hours later while he was still in custody and still not arraigned, was also a product of unnecessary delay. Both statements should have been suppressed.

The opinion in support of affirmance refuses to suppress appellant's statements because the delay was occasioned by an investigation involving a charge unrelated to the homicide. The opinion reasons that because there is no indication that the police intentionally prolonged appellant's detention on the rape charge in order to obtain evidence concerning the homicide, the deterrent pur-

poses of the *Futch* rule would not be served by excluding appellant's admissions concerning the death of Carol Benson.[1] I cannot agree.

The purpose of the *Futch* rule is to promote compliance by the police with the prompt arraignment requirement of Pa.R.Crim.P. 122 and 130. As Mr. Justice Nix has stated:

> "This rule of exclusion was not developed primarily because of the unreliability of such evidence but rather because of our determination to require police conduct to comply with our procedural rules."

*Commonwealth v. Saunders*, 459 Pa. 677, 686, 331 A.2d 193, 197 (1975) (dissenting opinion of Nix, J., joined by Roberts, J.) ; accord, *Mallory v. United States*, 354 U.S. 449, 453, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957); *Commonwealth v. Cherry*, 457 Pa. at 205, 321 A.2d at 613.

The deterrent effect of the *Futch* rule would be undermined by a standard which rewards police who obtain incriminatory evidence from an accused after unjustifiably holding him on other charges in violation of the prompt arraignment requirement. The assertion in the opinion in support of affirmance that the exclusion of such evidence would not serve the deterrent purposes of *Futch* is unfounded. If the evidence obtained bears a relationship to the unnecessary delay, the deterrent purposes are served. The question should be whether the evidence is

---

1. The opinion in support of affirmance also suggests that we have no power to determine the propriety of the delay which took place before appellant's initial admission because the admissibility of appellant's confessions to the rapes is not before us. Such a rule would be a complete abdication of judicial responsibility. Appellant's statement was admitted over objection at trial and we cannot refuse to consider his claim that it should have been suppressed. In order to resolve the issue, we must determine the legal significance of the events which helped produce the state-Appellant's statement was admitted over objection at trial and we ment. Our jurisdiction and power to adjudicate appellant's suppression claim are in no way limited by the fact that he was originally arrested on an unrelated charge.

related to the unnecessary delay, not whether the reason for the delay was to obtain the particular evidence produced.

Since *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961), this Court has been guided by the principle that suppression of evidence obtained through improper police conduct furthers the deterrent purposes of exclusionary rules. Thus, for example, if incriminating evidence of a crime is seized incident to an illegal arrest for an unrelated crime, the evidence is not admissible. See e. g., *Commonwealth v. Mimms,* 471 Pa. 546, 370 A.2d 1157 (1977).

The inadvisability of the rule suggested by the opinion in support of affirmance is apparent from the facts of this case. Only through the exploitation of information gained during improper pre-arraignment delay did the police obtain an oral admission from appellant concerning another crime. The rule suggested by the opinion in support of affirmance would encourage the police to explore unrelated matters while holding an individual in custody.

## II

Even if appellant's first admission was admissible, the later statement should have been suppressed as the product of an independent violation of Pa.R.Crim.P. 130 and *Commonwealth v. Futch,* supra.[2]

After appellant's initial admission at 4:30 P.M., he was taken from the South Detective Division to the Police Administration Building. At 7:10 P.M., appellant was

2. The opinion in support of affirmance declines to consider this issue because appellant does not specifically "assert a *Futch* violation with respect to the murder investigation carried on at the Police Administration Building viewed by itself." Appellant has clearly raised a *Futch* claim with respect to all his admissions, however, and has made a record of the facts which support his claim. This Court cannot deny him relief simply because his brief does not articulate a particular application of the legal theory which supports his claim.

interrogated and denied any involvement in the Benson homicide. At 8:30 P.M., appellant submitted to a polygraph test which concluded at 9:55 P.M. Between 10:25 P.M. and 12:20 A.M., appellant was interrogated again and admitted involvement in the murder in more detail than in the admission he made at 4:30 P.M. This second statement was obtained at least 16¾ hours after his arrest.

All the delay after appellant's initial admission at the South Detective Division at 4:30 P.M. was unnecessary. The only purpose served by his subsequent detention was to provide an opportunity for the police to obtain a statement from appellant describing the crime in detail. That is not a permissible reason to hold an accused for an extended period before preliminary arraignment. See *Commonwealth v. Cherry*, supra; *Commonwealth v. Williams*, supra.

The facts in this case are similar to those of *In re Geiger*, 454 Pa. 51, 309 A.2d 559 (1973). Geiger was arrested at 6:30 P.M. on a rape charge. At 8:50 P.M., he admitted complicity but furnished no details. Thereafter, he was unwilling to repeat his earlier incriminating statement. Finally, at 5:05 A.M., 10½ hours after his arrest, Geiger again admitted complicity and provided some details. Over the next fourteen hours, he participated in a line-up, was interrogated, took a polygraph test and gave the police a written statement.

The delay in *Geiger*, had the same purpose as the delay in this case: to extract a complete description of the crime from an accused who had already incriminated himself. In *Geiger*, we found such delay unnecessary. Here, too, after appellant made his initial admission at 4:30 P.M., the subsequent pre-arraignment delay was unnecessary, especially since he was initially unwilling to provide any details after he was brought to the Police Administration Building. Since appellant's second state-

ment was prejudicial and was a product of unnecessary delay, it should have been suppressed.

I would reverse the judgment of sentence and grant a new trial.

Mr. Justice NIX and Mr. Justice MANDERINO join in this opinion.